and we'll turn to the next case on the day calendar 20-1495 Johnson v. AGS, etc. Mr. Todd? Yes, your honor. You're up. Thank you, your honor. May it please the court, my name is Jeff Todd on behalf of the appellant in this case. This case involves a stock purchase agreement over the sale of a gaming company, specifically an amendment to the purchase agreement that provides for payment of a $7 million hold back upon the final disposition of a Texas action, a Texas lawsuit involving the gaming equipment at a tribal facility in Texas, if that final disposition permits the continued operation of the equipment. The fundamental flaw of the district court's opinion in this case was her adoption of the defendant's argument that the parties understood at the time they executed the amendment that any new gaming proposals were subject to the Texas court's long-standing pre-approval process. That was her finding at page 17 and 18 of her order. The district court took that finding and used it to support her conclusion that the word permit, as used in the amendment, required an express finding of permissibility of the modification of the tribe's games. And that is found at page 18 of the district court's opinion. There, the court found that this interpretation is supported by the plain meaning of the word permit, which is to find something permissible. She then supported that by saying, this conclusion is further reinforced by the fact that the parties understood at the time they executed the amendment that any new gaming proposals were subject to the Texas court's long-standing pre-approval process. Again, at page 18. But your honors, the district court's conclusion regarding the parties' understanding is clearly wrong and contrary to the undisputed facts in the record. Indeed, at the time of the amended stock purchase agreement in 2013, the tribe was operating without pre-approval in reliance on the Texas court's national party vendor exception that was recognized in a modified injunction. And you can find that at the record in the appendix at page 133, specifically set out in the March 6, 2015 order that preceded the final disposition, the May 2016 order. There, in the March 6 order, it specifically states, specifically according to the Pueblo defendants, that sweepstakes currently offered by Speaking Rock and Socorro are permitted national third-party vendor sweepstakes for which the Pueblo defendants, here the tribe, did not need prior judicial approval. So therefore, the Texas motion that's cited in the stock purchase agreement was entered into substantially over whether or not the amendment was entered into to determine whether or not the pre-approval was required for the sweepstakes being played by the tribe via its national vendors. The court's conclusion in that case was that the parties understood that any new gains were subject to the pre-approval process, but that was wrong. Because that conclusion was wrong, the basis for the court's finding that permissment expressed permission was therefore also wrong. The Texas court ruled that the exception didn't apply, but ultimately eliminated the pre-approval requirement in its May 27, 2016 order. This was the result, was a huge success for the tribe, which is why they didn't appeal the March 2015 or the May 2016 order, and the Texas action was finally resolved, which permitted the tribe to modify its gains and continue operations with bingo. And that's exactly what the court did. The amendment, which is at issue here, was result-oriented. It wasn't focused on what the Texas court did. It was what was the final disposition. What did it permit? And here, a plain reading of the word permit clearly shows either an express or a passive meaning. Excuse me. Yes. Your initial three minutes have expired. Okay. Let me ask Judge Kears if she has any questions. No questions. Thank you. Judge Pooler? I have no questions. Thank you. Go ahead, Mr. Todd. Finish up. Thank you, Your Honor. And so, as was cited in our briefs, there's multiple New York cases that hold that the word permit has a passive meaning. It goes back to the 1894 case of Robertson, which explained that to permit usually implies a power to prohibit or prevent, but can be either expressed or implied. And there's other cases. And so, because of the courts, the district courts in this case, reliance on the improper reliance on what she assumed that the parties understood, she concluded that permits meant express permission. However, when you look at the dictionary definition, it clearly provides for express permission or passive permission. You can permit something by simply allowing it to happen. And so, therefore, if the parties in this case intended to limit the word permit to an express permission or something specific, they needed to put that in the contract. Just like in the notice cases that we cited, if a party wants to limit notice to written notice, they have to specify it. That's clear law. And so, here we have a little bit of a misunderstanding in that the district courts utilized parole evidence to support her decision, but she didn't first conclude whether or not the language at issue was ambiguous. So, it's difficult to understand whether or not the district court concluded that it was ambiguous or simply, as sometimes she stated, she supported her decision based on parole evidence. But either way, she defied the basic rules of contract interpretation. Finally, I would point out that, again, on page 18, she supported her decision by saying that it was clearly Amaya's intent in negotiating in terms of the stock purchase agreement to reduce its exposure to risk. But, Your Honors, that is nowhere to be found in the contract. The district court relies on an email and some emails either before or after. So, again, she's relying on parole evidence to conclude what their intent is. We believe there's disputed parole evidence. But, at any rate, the four corners of the document do not mention any risk. And, in fact, the party here, Amaya, did nothing to contract against risk either with the original stock purchase agreement or when it negotiated the amendment to the stock purchase agreement. So, therefore, we believe that the court, in this case, clearly erred. She clearly incorrectly applied the contractual construction of the words at issue. And she improperly relied on disputed parole evidence to come to her conclusion. I reserve the rest of my time. Thank you, Mr. Todd. We'll hear now from Mr. Saxel. Good afternoon. May it please the court, Stephen Saxel for the appellee, Amaya. The district court properly granted Amaya summary judgment based on the plain meaning of the contract and the undisputed facts. Plaintiffs did not claim any genuine issue of material fact exists. And neither party claimed the contract was ambiguous. The Texas federal court order, which plaintiffs now somehow claim constituted permission and satisfied the Texas clearance event condition, found the tribe in contempt for operating on lawful gaming, declared the tribe's use of such gaming equipment unlawful, and expressly said the court would not opine on whether any proposed bingo activities by the tribe are permissible because the legality of the tribe's purported bingo operations is not before this court. The Texas court not opining on permissibility was not permission. It did not provide clearance, as Amaya had bargained for. Now, plaintiffs argue that the district court improperly considered parole evidence, but the court expressly based its ruling on the plain meaning of permits in the context of the agreement. The court did not find the term ambiguous in this context. Judge Abrams' order cited extrinsic evidence only after determining plain meaning and said it did so only to, quote, confirm there is no material dispute of fact regarding the meaning of permits in the amended stock purchase agreement. Plaintiffs' arguments ignore the undisputed circumstances in which the parties made this agreement and what the parties sought to accomplish and is not reasonable. Plaintiffs argue that permits can have a passive meaning, but not in the context of this provision, which requires a court to permit. Indeed, the court, the contract makes clear on its face that the First Amendment came about because of the Texas action in which the Texas court would be ruling on whether the existing sweepstakes operations were permitted and had a permission process in place at the time of the contract to pre-approve other gaming activities. Those were the surrounding circumstances in which to understand the contract objectively. Indeed, the Texas court order denied the tribe's motion to vacate the broad 2001 injunction prohibiting the tribe from unlawful gaming under Texas law, and that injunction remained in place as plaintiffs concede on page 17 of their reply brief and elsewhere. Plaintiffs offer no way to determine what's permitted under their reading, whether lawful or unlawful. The Texas attorney general, indeed, made clear that it would be unlawful for the tribe to operate bingo games. In fact, the attorney general then commenced a new action in which the Texas federal court declared bingo unlawful and the Fifth Circuit affirmed, thereby confirming that there was never any permission for the tribe to operate bingo. In conclusion, there was no Texas clearance event, so the conditions for payment of the holdback were not satisfied. There is no disputed issue of material fact precluding summary judgment, and the judgment below should be affirmed. Judge Kears, any questions? No questions. Thank you. Judge Pooler. Thank you. I have a question. If, as you say, the Texas court never approved bingo games, how come they're going on now? Because the tribe has continued to do it. The district court, in the subsequent action, stayed at its ruling, pending appeals. The Fifth Circuit affirmed, and a cert petition is now pending. But Amaya bargained for clearance. The tribe, in contrast, continued, and there's a long history here, has continued to engage in gaming regardless of the legal peril. Indeed, it was found in contempt in the Texas court order. And that's obviously a long-running dispute between the tribe and the state of Texas. But that kind of cat-and-mouse approach is not what Amaya bargained for. Amaya bargained for specific Texas clearance conditions. So are they operating extra-legally? I believe they are, but I understand the order stayed pending the cert petition, or at least pending appeals, and there's a cert petition. So appeals have not been exhausted. Thank you. So the court never gave what was called a final or clearance order so that the holdback can continue to be held back. That's your argument, isn't it? Yes. There was never a Texas clearance event, correct. There was never an order permitting continuing operation. And yet the operations continue. Well, the tribe continued. Not with our equipment. Our equipment, the tribe terminated the contract with us years ago. But the question here, the history here is that, as recited on the face of the contract, because of the Texas action and what Amaya learned, Amaya did not want to take the regulatory and legal risk that the tribe was willing to take. Amaya wanted clearance, and that clearance requires the court permitting this activity, and the court never did. Thank you. I have no further questions. Thank you. Mr. Todd, you've reserved two minutes. Thank you, Your Honor. Respectfully, that is exactly the nuance that creates the error in this case. If you see on page 16 of the district court's opinion, she also reiterates what Mr. Saxel just argued, that the Texas court did not permit. Well, that's not what the contract says. Page 7 of the amendment specifically provides that one of the Texas clearance events is the final disposition of the Texas motion or Texas action which permits continued operation of the equipment, with or without modification. That is different. If you say it as the Texas court must permit, then that implies an express permission from the court. But that's not what the contract provides for. It provides for a final disposition. And here, you did have a final disposition that permitted, that allowed the continued operation of the equipment, because that's exactly what happened. The purpose of the amendment was to determine the result of the action, and the result was that the Texas court withdrew its requirement for preapproval, allowed the modification of the equipment, which then allowed the tribe to modify the equipment and continue operations through bingo, which it has for years and years. So that was so favorable that the tribe did not appeal the determination that the sweepstakes was illegal. It was so favorable that the tribe simply modified and moved forward, and that was where we specifically meet that. Finally, Mr. Sackville argued that they bargained for no risk, but that was not the case. If they had done that, they could have contractually provided that we'll only pay it if the court specifically finds that these sweepstakes are legal. That's not what they contracted for. They contracted for a final disposition, which permits continued operation. Permits can be expressed or passive. In fact, in the list that the New York court stated, it generally would be passive, and that's what happened here. It's a unique situation that no one expected, but it occurred, and it allowed us to meet that requirement. Thank you, Your Honors. Thank you, Mr. Todd. We'll reserve decision in 20-1495, and we'll move to the next case for oral argument, which is 20-1514, Vengalatori v. Cornell University et al. Mr. Kruckenberg. Thank you, Your Honor. Thank you, Your Honor. Caleb Kruckenberg for Dr. Moken Vengalatori. Dr. Vengalatori was a well-respected tenure-track professor with a major scholarly output until he was the victim of gender and racial discrimination through a rigged disciplinary process. After asking a graduate student to leave his lab for court performance, the student swore to a faculty member that she would make sure Dr. Vengalatori had a hard time getting tenure. Years later, after his peers recommended him for tenure, the student made good on her promise and made an unsupported complaint of sexual impropriety five years after the alleged incident. Dr. Vengalatori was funneled into a disciplinary process that was designed to result in punishment for male students and faculty, and even then not provided with the limited protections that were set out by that policy. Dr. Vengalatori was never given an explanation of the charges, much less access to the evidence against him, while his accuser was provided with an advisor who actively worked with the investigators to revise the student's statements in light of other accounts. The investigators also ignored testimony provided by other students that the accuser had a history of making false accusations and racially and sexually charged statements, when much of that testimony came from male students of Indian descent. Cornell ruined Dr. Vengalatori's career by branding him as a sexual abuser through a system tainted by racial and gender discrimination. The district court's dismissal here would eliminate all of Title IX's protections against gender discrimination from an entire class of persons employed by educational institutions, never mind the Supreme Court's approval of a private Title IX claim brought by an employee of the school and the decisions of at least four other circuit courts. And the court ignored the clear deviations from applicable policy that gave rise to an inference of gender and racial discrimination in the disciplinary process. The district court also ignored the overwhelming force of the Department of Education's action to undermine basic procedural protections for those accused of sexual misconduct on college campuses. Finally, the court wrongly concluded that the Department of Education could not bear any responsibility for its unlawful campaign to remove basic protections for accused students and faculty. These errors warrant reversal so that this case can move forward to discovery. And, Your Honors, I welcome any questions from the bench. Thank you, Mr. Krekenberg. I'm going to ask my colleagues momentarily to put some questions to you, but I have a simple threshold question. Could you summarize what the procedural irregularities are in the process that Cornell afforded to your client? Well, Your Honor, there were a number of them. And one of the most glaring procedural irregularities was the fact that the investigators ignored the applicable limitations period. The policy said very clearly that it was applicable for acts that had occurred within a year. And here there was an investigation into something that had allegedly happened five years earlier. In addition, the policy made it very clear that Dr. Vengelator was entitled to notice of the specific accusations against him. He was entitled to see the evidence presented against him. And he was also entitled to present testimony and evidence in his own favor. And he repeatedly posed questions and evidence for the investigators to consider, and they ignored it. In addition, the policy said that no party, whether the accuser or the accused, is guaranteed any sort of advocate, any sort of faculty advisor or attorney. But here there was a special advisor appointed only to the accuser and denied to Dr. Vengelator. Now, all parties were notified, were they not, that the university was proceeding under the romantic relationship policy? Well, that is not entirely accurate. And to the extent that Cornell has argued now that there was a separate policy other than policy 6.4, that is a factual dispute. And again, here this is simply on a motion to dismiss. But the record shows a number of instances where Cornell invoked policy 6.4, not the separate faculty sexual relationships policy. And just sort of as a threshold, I'll note that the sexual relationships policy that Cornell is invoking now, it's not a procedure. It's simply a policy. That document is just a couple of pages long. The procedure, though, is set out in policy 6.4. And as we indicated in the complaint, and that's at joint appendix page 69, policy 6.4 says specifically that it applies to allegations of sexual impropriety against faculty, just the same as it does to students. And in fact, the investigators invoked policy 6.4. They did so in e-mails. They did so in the final report. They said this is in accordance with policy 6.4. Judge Kearse, any questions for Mr. Korkenberg? No questions. Thank you. Judge Pooler? I have no questions. Thank you. All right. So you reserve two minutes. Omar, you have more time. Mr. Korkenberg, why don't you finish? Yes, Your Honor. And I just want to highlight probably the most important issue before this court today. And that's the right, the private right of action for Title IX. And the district court did not reach the merits. It didn't have anything to say about whether or not Title IX claim was adequately pled. And instead, the district court said that a faculty member, as opposed to a student, is not allowed to sue under Title IX, no matter what. And that is simply inconsistent with the statute and inconsistent with the law. And as we note in our brief, the most important case on that comes from the Supreme Court itself, the Jackson case, where the Supreme Court recognized that there is a Title IX private right of action for a coach at an educational institution for retaliation. And certainly, the Supreme Court would not say that if there was not more generally a right, a private right of action for faculty under Title IX. And all of the courts that have considered that case, that have considered this issue after Jackson, have concluded that it is clear from that decision that there is a right of action for faculty. Well, how did Judge Sharp deal with this issue that you're raising now? Well, Judge Sharp ruled the other way. He said that there was no private right of action because there's a Title VII general remedy for employment discrimination more broadly. And Judge Sharp concluded that because there was another remedy available, he could not imply a cause of action. And that reasoning was rejected by the Supreme Court when it established the private right of action in Gannon in the first place. The Supreme Court said just because there's other remedies doesn't mean that there's not a remedy under Title IX. And it makes a lot of sense when you look at Title IX versus Title VII because Title VII applies more broadly to all employment situations, whereas Title IX, of course, applies in educational context. And so on scrutiny, the district court's reasoning doesn't withstand scrutiny. It doesn't hold up. Now, is it possible? Our circuit has never, in your view or in Judge Sharp's view, recognized the existence of a private right of action for sex discrimination under Title IX for employees. Is that the case? So this court in the SUMA decision recognized the issue